UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | |
|---|---|
| JOHNNY DAVIDSON, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 7: 06-129-DCR |
| ) | |
| V. ) | |
| ) | |
| UNITED STATES OF AMERICA ) | |
| DEPARTMENT OF HEALTH AND ) | **MEMORANDUM OPINION** |
| HUMAN SERVICES, et al., ) | **AND ORDER** |
| ) | |
| Defendants. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the Plaintiffs' motion for leave to increase their claim for damages. [Record No. 139] In support, they contend that they have become aware, subsequent to filing this action, that Emma Davidson's ("Emma") medical condition has improved and that she will now require more therapy and various medical equipment. In addition, the Plaintiffs state that Emma is more cognizant than they previously believed. The Defendants have opposed the motion, claiming that motion is untimely and that the Plaintiffs were reasonably capable of detecting the alleged "newly discovered evidence" or "intervening facts" relating to Emma's condition.

**I.   Background**

Emma was born October 14, 2003. At that time, she was diagnosed with severe ischemic hypoxic encephalopathy associated with microcephaly, spastic quadriparesis, profound developmental delay and a seizure disorder. [Record No. 147, Ex. 2] Dr. William Robertson,

-1-

a neurologist at the University of Kentucky, began treating Emma on November 5, 2003. Initially, Dr. Robertson described Emma as having "no visual curiosity or pursuit" but stated that she may, in the future, be able to recognize her family and have the capacity to smile. [Record No. 147, Ex. 2] He noted that she had experienced damage to both the white and gray matter of her brain and that "the damage was so severe [it] would produce profound handicaps in terms of her neurologic function . . . such as sitting, standing, walking, hearing, being able to analyze visual information, speech, language, function." [Record No. 147, Ex. 3, pp. 23-24] He further opined that Emma's condition was "not treatable" and that it was irreversible. [Record no. 147, Ex. 3, p. 24] However, Dr. Robertson noted that she could receive ancillary help to try to maximize her abilities or her potential, but stated that, in his opinion, there was no "specific type of effective treatment." [Record No. 147, Ex. 3, p. 24]

On January 20, 2004, Dr. Robinson noted that Emma's condition had improved. In particular, he indicated that she was "able to eat by herself . . . and [she] was not having to be fed artificially by a tube into her stomach." [Record No. 147, Ex. 3, p. 25] He further noted that she was more alert and was able to support some of her weight when placed in a standing position. [Record no. 147, Ex. 3, p. 25]

The Plaintiffs filed their administrative claim on January 25, 2005, and their Complaint in this action on February 22, 2006. Emma's treatment with Dr. Robinson ended in June 2005. At that time, her parents enrolled her in a program at the Institutes for the Achievement of Human Potential ("IAHP"), which uses a type of therapy called the Doman-Delacato technique of psychomotor patterning.

According to the Defendants, a number of experts are highly critical of the patterning treatment offered at the IAHP. In particular, Cameron Parker, a RN and Certified Life Planner retained by the Defendant in this case, stated that the patterning treatment is not supported by either the American Academy of Neurology, the American Academy of Physical Medicine and Rehabilitation, the American Academy of Pediatrics, or the American Academy of Cerebral Palsy. [Record No. 147, Ex. 8, p. 3] Dr. Edward Hoffman, the developmental pediatrician retained by the Defendants, conducted an independent medical exam of Emma and found that the "patterning treatment she is receiving has no support in the medical or psychological peer review literature nor from established professional societies and it is highly unlikely she is achieving or will achieve the . . . neurodevelopmental recovery and progress reported or attributed to this controversial approach." [Record No. 147, Ex. 9, p. 5]

The Plaintiffs have indicated that they are seeking to increase the monetary amount for Emma's future care from $11,000,000.00 to an amount ranging from $14,000,000.00 to $21,000,000.00. In addition, the Plaintiffs state that they are seeking to increase their claim for physical pain and mental anguish because Emma is "more cognizant and aware than previously thought." [Record No. 139]

**II.    Analysis**

Under the Federal Tort Claims Act ("FTCA"), the United States is liable for the torts of its employees while acting within the scope of their employment. 28 U.S.C. § 1346(b). In general, a plaintiff is limited to the amount of damages alleged in her administrative claim under the FTCA, 28 U.S.C. § 2675(b), unless the plaintiff can demonstrate: (1) that the evidence

supports the increase in the prayer over the administrative claim; and (2) that the allegedly newly discovered evidence or intervening facts were not reasonably capable of detection at the time the administrative claim was filed. 28 U.S.C. § 2675; *see Allgeier v. United States,* 909 F.2d 869 (6th Cir. 1990); *see also Low v. United States*, 795 F.2d 466, 469 (5th Cir. 1986). The Sixth Circuit has adopted a strict interpretation of the statutory language set forth in § 2675(b), requiring that an intervening fact be unexpected or unforeseen. In support of this strict interpretation, the court has recognized that the purpose behind § 2675(b) is to ensure that federal agencies charged with the responsibility of making decisions regarding whether to settle tort claims against the United States government are given notice of the maximum potential liability. *Allgeier*, 909 F.2d at 878.

In *Allgeier*, Sixth Circuit considered whether the district court erred in awarding damages exceeding what the plaintiff initially sought in her administrative claim. In that case, the plaintiff sustained injuries to both of her knees as a result of a motor vehicle accident on March 6, 1984. She was awarded $104,000.00 at trial but had only administratively claimed $50,000.00. The United States argued that she had not met her burden of demonstrating newly discovered evidence or intervening facts. On appeal, the Sixth Circuit noted that when she filed her administrative claim,

> Boldrick was aware of the chondomalacia injury to both her knees (that is, roughness on the inside of her kneecaps) and the resulting painful crepitus ("crunching" sensation when moved). The pain appeared to increase and abate from time to time over the course of her [medical] treatment with Dr. Witten, which began on March 22, 1984. Approximately one year before she filed her claim, Boldrick had discussed having arthroscopic surgery, and was told by Dr. Witten that both her knees needed the procedure. Boldrick decided to have the

> surgery done on the right knee because it was "the worst," and the operation was performed on April 2, 1985.
>
> Shortly before the claim was filed, it appears that Boldrick's condition had improved and that the additional surgery was no longer contemplated. Dr. Witten testified that during an examination on January 16, 1986, just six weeks before Boldrick filed her claim, Boldrick told him that both knees were feeling much better. At that examination, Dr. Witten was unable to find any crepitus in the left knee, although Boldrick told him that she could feel it when she moved the knee. Perhaps more importantly, Dr. Witten told her during that visit to "see [him] if she had any problems in the future." Boldrick may have been led thereby to believe that her injuries were to some extent, cured.

*Id.* at 878-79.

Boldrick's condition worsened over the next eighteen months. She had a medical exam of her left knee on September 3, 1987, which "showed creptius throughout its range of motion." *Id.* at 879. Despite conflicting evidence, the Sixth Circuit upheld the district court's decision, finding that the plaintiff's need for a second knee operation and additional treatment were "not reasonably foreseeable" at the time the tort claim notice was filed due to the post-filing deterioration of her medical condition. *Id.* at 878-79.

In contrast, in *Low v. United States*, 795 F.2d 466 (5th Cir. 1986) , the Fifth Circuit reversed a district court's award of damages in excess of the claimed administrative amount, finding that the plaintiff's prognosis was reasonably capable of detection at the time the administrative claim was filed. The plaintiff's child (Brian) suffered from cerebral palsy, a seizure disorder, blindness, deafness, and mental retardation. The district court determined that the severity of Brian's medical problems were not discoverable at the time the administrative claim was filed. The Fifth Circuit disagreed, finding that Brian's medical condition had not changed since the plaintiff filed her administrative claim. Specifically, the court held that the

plaintiff could have precisely determined the severity of Brian's condition at the time the claim was filed and that the knowledge concerning his condition was not due to either newly discovered evidence or intervening facts as required pursuant to § 2675(b).

Although the Plaintiffs rely on *Allgeier* to support their position that the Court should allow them to increase their damage claim, stating that Emma has had an unexpected and/or unforeseen change in her medical condition, the facts of the instant case are more analogous to *Low* than *Allgeier*. The evidence demonstrates that the Plaintiffs knew or reasonably could have foreseen through the exercise of reasonable diligence that Emma's condition might improve over time. Emma was diagnosed, at birth, with the severe ischemic hypoxic encephalopathy associated with microcephaly, spastic quadriparesis, profound developmental delay and seizure disorder and her parents were aware of her treatment options prior to filing their administrative claim (filed 15 months after Emma's birth). The Plaintiffs have not refuted the Defendants' claim that they investigated the IAHP program shortly after Emma's birth and attended IAHP's Lecture Series I in December of 2004, approximately one month prior to filing their administrative claim. Moreover, the evidence of record demonstrates that the Plaintiffs were informed that Emma was making some improvements as of January 2004 when Dr. Robinson examined her and noted that she was "able to eat by herself . . . [and] was not having to be fed artificially by a tube into her stomach." At that time, Dr. Robinson also stated that Emma was more alert and was able to support some of her weight when placed in a standing position. Similar to *Low*, this is not the type of case in which the Plaintiffs can assert that they did not know or reasonably could not have known the basic severity of Emma's handicap. In fact, the

Plaintiffs acknowledge its severity but claim they were not fully aware of its extent and duration and the treatment options that were available. However, as noted by the *Low* court,

> if the exact nature, extent and duration of each recognized disability must be known before § 2675(b) will be given effect, that section will be rendered useless; and the government will be unable to evaluate any claim made against it without the treat that, if it does not settle, its liability may increase substantially.

*Low*, 795 F.2d at 471.

Because the goal of the administrative claim requirement is to let the government know what it is likely up against, it is incumbent on the plaintiff to "determine the worst-case scenario or, if uncertain, to paint the picture as bleakly as reason permits and conscience allows." *Reilly v. United States*, 863 F.2d 149 (1st Cir. 1988). As such, the Plaintiffs, aware that the IAHP treatment was available, had more than sufficient notice when they prepared their administrative claim to include in their damage claim an amount of money to compensate them for any developmental progress that Emma could potentially obtain with the treatment.[1]

### III.    Conclusion

For the reasons discussed above, it is hereby **ORDERED**

that the Plaintiffs' motion for leave to increase their claim for damages [Record No. 139] is **DENIED**.

This 19th day of July, 2007.

---

[1] The January 29, 2007, deadline to file amended pleadings in this case has expired [Record No. 89] and the discovery period will end July 31, 2007. [Record No. 160] The Defendants will likely suffer prejudice if the Court were to allow the Plaintiffs to increase their damage claim at this stage in the proceedings.



Signed By:

*Danny C. Reeves* DCR

United States District Judge